# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 23-1588V

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |  |
|---|---|---|
| | \* | Chief Special Master Corcoran |
| GRISELDA CRUZ BURGOS, | \* | |
| | \* | Filed:  May 28, 2026 |
| Petitioner, | \* | |
| | \* | |
| v. | \* | |
| | \* | |
| SECRETARY OF HEALTH AND | \* | |
| HUMAN SERVICES, | \* | |
| | \* | |
| Respondent. | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Amy Senerth,* Muller Brazil, Dresher, PA, for Petitioner.

*Alec Saxe,* U.S. Department of Justice, Washington, DC, for Respondent.

### ENTITLEMENT DECISION[1]

On September 14, 2023, Griselda Cruz Burgos filed a petition for compensation ("Petition") under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-1 to -34 ("Vaccine Act" or "Act"). Petitioner alleged that she developed small fiber neuropathy ("SFN") due to a tetanus, diphtheria, and [acellular] pertussis ("Tdap") vaccine received on March 29, 2021. Petition at 1.

The parties accepted my proposal to resolve this matter on the written record, and have filed briefs in support of their positions. *See* Petitioner's Brief, dated August 18, 2025 (ECF No. 21) ("Br."); Respondent's Response, dated September 18, 2025 (ECF No. 22) ("Opp."); Petitioner's Reply, dated October 1, 2025 (ECF No. 23) ("Reply"). Now, for the reasons set forth below, I deny entitlement.

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

## I.    Factual Summary

Prior to vaccination, Petitioner reported to her doctor, Jamie McAllister, D.O., at Adult & Adolescent Family Medicine on March 12, 2021, that a week before (March 4, 2021), she had developed a sharp pain on the back of the right side of her head (described as "ice pick" like), lasting seconds and followed by a constant ache. Ex. 6 at 4. Right occipital neuralgia was suspected. Dr. McAllister prescribed warm compresses, and starting MediGoldOne (Diclofenac Sodium) and then taking Voltaren (another Diclonfenac Sodium medicine) to alleviate symptoms. *Id.*

Petitioner subsequently received a Tdap vaccine at the age of 37 at the St. Charles Family Care clinic in Redmond, Oregon on March 29, 2021. Ex. 1 at 148–49. There is no medical record evidence of any immediate reaction.

About two weeks later, on April 13, 2021, Petitioner went to the emergency department ("ED") of Samaritan North Lincoln Hospital, complaining of right forearm pain, numbness, and swelling. Ex. 2 at 12. Petitioner informed the treaters that an hour before seeking ED assistance, she had been at a casino gambling, and noticed her arm "became sore and achy" when resting on a slot machine table game, with the sensation not going away when she moved her arm to her lap (although treatment with ice and a compression sleeve afforded some relief). *Id.* at 12, 14.

On examination at the ED, Petitioner displayed focal tenderness in the palm side of her right forearm. Ex. 2 at 16. Otherwise, she had normal sensation and full range of motion of her right upper extremity, albeit with pain. *Id*. Neurological examination revealed no sensory deficits or weakness. *Id*. The examining emergency medicine physician diagnosed Petitioner with acute radial nerve palsy of the right upper extremity, noting that she was "neurovascularly intact," and that an explanation for the pain might be "a process similar to [petitioner's] radial nerve palsy from resting her forearm against the slot machine." *Id*. at 17. Petitioner was given a forearm splint to maintain her wrist in a neutral position and discharged home, with instructions to follow up with her primary care provider ("PCP"), if her symptoms worsened or did not improve. *Id.*

Toward the end of that same month (April 27, 2021), Petitioner followed up with a nurse practitioner ("NP") in her PCP's office. Ex. 1 at 144. She recalled her recent ED visit, and also reported "transient" symptoms of hand and feet numbness and tingling (although contemporaneous medical records only document ED complaints of right forearm symptoms). *Compare* Ex. 1 at 144 *with* Ex. 2 at 12. She now also claimed the symptoms had begun on her left side and resolved, but had moved to her right side. Ex. 1 at 144.

A review of systems was positive for numbness, but the examination revealed no focal neurological deficits, sensory deficits, or weakness. Ex. 1 at 145–46. The NP was also informed

2

that Petitioner had five days earlier discontinued a thyroid medication for in vitro fertilization she had begun on April 6, 2021, and that the symptoms had started not long after first taking the medication (with improvement once she ceased its use). *Id.* at 144–45. Petitioner was referred to a neurologist. *Id*. at 144.

Petitioner had that neurologic consultation almost six weeks later (June 7, 2021), with David Schloesser, M.D. Ex. 3 at 8. She now provided a more expansive medical history, noting that in February 2021 (hence pre-vaccination) she had developed right occipital neuralgia and difficulty moving her neck, which resolved over several weeks. *Id*. She further recalled her April 13th treatment for pain in the right forearm with intermittent tingling in her fingers. *Id*. By April 21st, she reported, she was experiencing tingling in all extremities, numbness in her feet ascending to the calves and upper extremities, and went to a hospital ED, where a brain MRI yielded normal results. *Id*. By April 27th, she had developed difficulty ambulating, swelling in the legs, and discomfort in the pads of her feet. *Id*. She added that these symptoms had persisted for several weeks but had improved such that she felt 90% back to baseline at the time of this visit. *Id.*

On examination, Dr. Schloesser documented Petitioner's full strength, normal sensory and cerebellar testing, and reflexes of 1+ biceps, 2+ triceps, 2-3+ patellar, and 1-2+ ankles, but noted a mild residual right-side Bell's palsy in her face. Ex. 3 at 9. Dr. Schloesser diagnosed Petitioner with paresthesias, and ordered a cervical spine MRI to rule out transverse myelitis or structural lesions, laboratory testing for inflammatory and thyroid markers, and a wrist splint for nighttime use, given possible intermittent median nerve entrapment. *Id.* The MRI was performed the next day but yielded unremarkable results. *Id.* at 18.

On June 26, 2021, Petitioner went back to her PCP's office complaining of abdominal pressure when eating, extreme thirst, pharyngitis/GERD type symptoms, bilateral flank pain, polyuria, and difficulty urinating, relating these symptoms to a "cold type" illness she had experienced several days before (with the flank and urinary issues beginning the night before). Ex. 1 at 125. A urine culture confirmed the presence of an E. coli infection, and a NP diagnosed her with mild pyelonephritis and acute gastritis. *Id*. at 128–29.

Petitioner saw Christopher Schuler, M.D., at her PCP's office, on August 11, 2021, after experiencing a brief, isolated vision disturbance the day before, and at this time reported persistent paresthesias. Ex. 1 at 115. Dr. Schuler noted Petitioner's unremarkable neurological workup thus far, including her normal MRIs and "several labs done in June[,] . . . including standard CBC, CMP and a variety of autoimmune labs that were negative." *Id*. Dr. Schuler diagnosed Petitioner with vision impairment thought "poss[ibly] related to her paresthesia reaction," and advised her to follow up with her neurologist, Dr. Schloesser. *Id*. at 114–15.

Petitioner followed up with Dr. Schloesser roughly one month later, on September 13, 2021. Ex. 3 at 5. She reported that she was "gradually improving," but that she still "ha[d] a feeling of discomfort in the forearms with activity." *Id*. She also stated that she "fe[lt] heavy in [her] legs[,] with some tingling of the right [leg] greater than left [leg] at times [and seemingly] associated with activity." *Id*.

On examination, Petitioner was found to have "intact cranial nerves, strength, and sensation, with symmetrical reflexes at 2/4 throughout." Ex. 3 at 5. A right lower extremity nerve conduction study ("NCS")[2] yielded normal results. *Id.* Dr. Schloesser diagnosed Petitioner with unexplained paresthesias, adding that he could not "identify evidence for a resolving form of Guillain-Barre syndrome, chronic inflammatory demyelinating polyneuropathy, or other peripheral nervous system problems such as mononeuritis multiplex." *Id.* at 6. He also noted that Petitioner's lab test results and brain and cervical spine MRIs had been normal. *Id*. Despite his inconclusive determination, Dr. Schloesser recommended a trial of gabapentin for treatment of Petitioner's "discomfort." *Id.*

Two months after, on November 22, 2021, Petitioner returned to her PCP complaining of slowly improving but ongoing paresthesias that were adversely affecting her quality of life. Ex. 1 at 90. She reported that she could not carry her daughters, use a cellular telephone, or type. *Id.* at 91. On exam, Petitioner exhibited objective weakness of the right upper and lower extremities, with 4/5 right dorsiflexion, wrist extension, wrist flexion, and finger abduction strength and decreased reflexes in the lower extremities. *Id*. at 92–93.

While visiting her PCP in November 2021, Petitioner requested a referral for a second neurological opinion, and she obtained one from Anson Wilks, M.D., on December 22, 2021. Ex. 1 at 91, Ex. 5 at 42–44. She now reported acute right forearm pain that she recalled began a week to ten days after her March 2021 vaccination, and characterized the pain as sharp and cramping, with transient weakness of forearm flexion. *Id*. at 42. She further recalled (again, inconsistent with the actual contemporaneous medical record) that soon thereafter, she developed numbness and tingling in her feet ascending to her calves, with several days of saddle anesthesia, and that symptoms worsened so significantly that she later required a walker due to leg weakness, swelling, and falls. *Id*. She had subsequently experienced improvement without relapse, though she said she continued to experience calf cramps (worse at night), muscle fatigue, difficulty lifting heavy objects, numbness on the top of the right foot, and toe pain. *Id*.

On examination, Dr. Wilks observed normal strength, reflexes, and vibration sense, with a pinprick gradient, in the arms and legs. Ex. 5 at 44. Dr. Wilks assessed Petitioner with paresthesias,

---

[2] Nerve conduction studies measure the speed and strength of electrical signals in the nerves. *See Nerve Conduction Studies* and *Electroneurography*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=15860 (last visited May 4, 2026).

pain, and subjective weakness following vaccination, with possible mild Guillain-Barré syndrome ("GBS") or acute SFN. *Id.* Dr. Wilks recommended an NCS and electromyography[3] ("EMG"). *Id.*

Petitioner underwent the EMG/NCS that day (Ex. 5 at 23), which Dr. Wilks subsequently summarized in a January 7, 2022, addendum to his December 22, 2021, treatment note:

> EMG/NCS was normal confirming clinical suspicion for small fiber neuropathy. Laboratory investigation has been negative. The proximity of her symptom onset to vaccination could be consistent with acute small fiber sensory neuropathy, which some consider a mild, limited GBS, with an antecedent vaccination. However, the association with vaccination is unclear and not definitive.

*Id.* at 44.

Petitioner had additional treatment in 2022 for urinary issues, including recurrent urinary tract infections, as well as pyelonephritis[4] of the right kidney and related symptoms. *See generally* Ex. 1 at 8–63. But her prior paresthesias or neurological symptomatology were not addressed at any of these visits. No further records have been provided for the period after mid-2022 that are relevant to this case.

## II.    Expert Reports

### A.    Petitioner's Expert – Dr. John Hixson

Dr. Hixson is a neurologist, and he prepared two written reports for Petitioner. Report, dated October 30, 2024, filed as Ex. 11 (ECF No. 15-2) ("First Hixson Rep."); Report, dated June 1, 2025, filed as Ex. 26 (ECF No. 20-1) ("Second Hixson Rep.").

Dr. Hixson attended Texas A&M University for his undergraduate degree, and Johns Hopkins University School of Medicine for his medical degree. *See* Curriculum Vitae, filed Oct. 30, 2024, as Ex. 12 (ECF No. 15-3) ("Hixson CV") at 1; First Hixson Rep. at 1. He then completed his residency in Neurology at the University of Pennsylvania, followed by a fellowship in Epilepsy and Neurophysiology at the University of Iowa. Hixson CV at 1. He is currently a Professor of Neurology at the San Francisco VA Medical Center and the University of California San

---

[3] EMG studies assess the extracellular activity of muscles at rest when introduced to electric shocks. *See Electromyography*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=15854&searchterm=electromyography (last visited May 4, 2026).

[4] A pyelonephritis is the inflammation of the kidney due to a bacterial infection. *Pyelonephritis*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=42228&searchterm=pyelonephritis (last visited May 4, 2026).

Francisco. *Id.* at 2; First Hixson Rep. at 1. Dr. Hixson is board certified by the American Academy of Psychiatry and Neurology. First Hixson Rep. at 1. Clinically, he sees patients in both an outpatient and inpatient setting—on average, Dr. Hixson sees approximately 30–35 patients per week and evaluates and treats patients with SFN as well as the most common form of GBS, acute inflammatory demyelinating polyneuropathy ("AIDP"). *Id.* at 1–2.

*First Report*

Dr. Hixson began his initial report with a review of Petitioner's medical history, consistent with what is discussed above. First Hixson Rep. at 2–4. He interpreted that history to confirm the propriety of an SFN diagnosis. SFN, Dr. Hixson explained, is a condition affecting certain unmyelinated sensory nerve fibers that "carry pain and temperature sensation." *Id.* at 6; T. Gendre et al., *Characterizing Acute-Onset Small Fiber Neuropathy*, 11 Neurol. Neuroimmunol. Neuroinflamm. 1, 7 (2024), filed as Ex. 18 (ECF No. 15-9) ("Gendre"). Individuals experiencing SFN would "usually report a sensation of burning and numbness in the lower extremities, which can then spread throughout the limbs." First Hixson Rep. at 6. SFN may otherwise involve "objectively normal findings on examination, as well as through EMG/NCS testing," making it important to confirm the diagnosis in other ways. *Id.*; Gendre at 7–8.

Dr. Hixson highlighted several features of Petitioner's history that he felt supported the SFN diagnosis. First Hixson Rep. at 2–4, 6–7. Within two weeks of vaccination, she complained of initial arm concerns, and then experienced worsening paresthesias in all limbs, followed by numbness and tingling sensations. *Id.* at 2. By later in the fall of 2021, the symptoms had not abated, but no other explanations were embraced until Petitioner saw a specialist (Dr. Wilks) in December, who proposed the diagnosis of acute SFN. *Id.* at 3–4. Dr. Hixson admitted, however, that "[c]onfirmatory tests for small fiber neuropathy, such as laser-evoked potentials, quantitative sensory testing ("QST"), or skin biopsy" were never performed on Petitioner. *Id.* at 6. He also did not in this report explicitly discuss, or discount, the possibility that Petitioner's initial symptoms related to her arm positioning while at a casino.

The record, Dr. Hixson opined, allowed for the possibility that Petitioner had experienced a "mild variant" of AIDP post-vaccination that was related to her ultimate SFN symptoms. First Hixson Rep. at 3, 4–5. Petitioner's initial presentation was somewhat consistent with "an isolated mononeuropathy," but as time passed "her symptoms became more suggestive of a diffuse process," with qualities associated with GBS (bilateral impact, ascending symptoms, ambulation issues). *Id.* at 5. In addition, Dr. Wilks had proposed that Petitioner may have had a mild GBS/AIDP precursor condition (although he seemed to rely mainly on the fact of antecedent vaccination for that conclusion, and acknowledged (as evidenced from the contemporaneous record) that there was no clearly-established association). Ex. 5 at 44. But because Petitioner was never more formally tested for AIDP, the likelihood of that diagnosis could not be evaluated

(although Dr. Hixson allowed that later EMG testing was normal—not inconsistent with SFN, but not confirmatory of GBS either). First Hixson Rep. at 6.

Dr. Hixson next discussed vaccine association, and concluded that the Tdap vaccine could cause SFN. Literature recognized that acutely-presenting SFN could be preceded by infection or vaccination. Gendre at 10. SFN was, moreover, theorized to be immune-mediated. *Id.* And case reports existed describing instances in which SFN occurred temporally after vaccination. *See*, *e.g.*, J. Finsterer, *Small Fiber Neuropathy as a Complication of SARS-CoV-2 Vaccinations*, 11 J. Fam. Med. Prim. Care 4071–72 (2022), filed as Ex. 21 (ECF No. 15-12); J. Kafaie et al., *Small Fiber Neuropathy Following Vaccination*, 18 J. Clin. Neuromuscul. Dis. 37–40 (2016), filed as Ex. 22 (ECF No. 15-13) (describing a case report of a fourteen year-old girl developing an acute onset of SFN after receiving a human papillomavirus vaccination).

There was also reliable support for a possible connection between SFN and GBS, in Dr. Hixson's view. He noted that GBS was already deemed to be likely caused by some vaccines— and that there was "controversy" in the medical literature as to whether an acute SFN was itself a kind of GBS variant. First Hixson Rep. at 6; U. Seneviratne & S. Gunasekera, *Acute Small Fibre Sensory Neuropathy: Another Variant of Guillain-Barré Syndrome?* 72 J. Neurol. Neurosurg. Psych. 540 (2002), filed as Ex. 24 (ECF No. 15-15) ("Seneviratne & Gunasekera") (following six patients with SFN over the course of fifteen months). If so, then the same causal reasoning applicable to GBS could reasonably be applied to SFN.

Dr. Hixson also opined that the Tdap vaccine likely caused Petitioner's SFN. First Hixson Rep. at 6–7. Her post-vaccination course logically fit, in his estimation, with a vaccine-induced injury (although Dr. Hixson's reasoning seemed rooted in the temporal association and progression of symptoms after vaccination). *Id.* at 7. Petitioner also had experienced no comparable symptoms pre-vaccination (and Dr. Hixson did not deem her prior Bell's palsy or occipital neuralgia to have any medical relationship with her post-vaccination symptoms). *Id.* And there was no other evidence of a possibly-explanatory cause such as an antecedent infection (although again Dr. Hixson made no mention of Petitioner's initial reports of physical harm to her arm due to positioning). Dr. Hixson concluded by deeming the post-vaccination timeframe in which Petitioner's symptoms began (two weeks after) to be medically acceptable, noting that it fell "squarely within the 3–42 day timeframe that is accepted for autoimmune neurologic processes." *Id.*

*Second Report*

Dr. Hixson's supplemental report responded to the opinions expressed by Respondent's two experts. First, he repeated his review of Petitioner's medical history, highlighting the fact that by December 2021 (over eight months post-vaccination), Petitioner had seen Dr. Wilks, who

7

interpreted her overall course and then-current presentation as consistent with either a mild form of GBS or SFN—an opinion Dr. Hixson shared. Second Hixson Rep. at 1–2. Although Dr. Hixson admitted that Petitioner's "initial clinical course and full constellation of symptoms was not straightforward," he felt that beginning within a month of her late-March vaccination her symptoms were mainly sensory in character. *Id.* at 2. He did acknowledge, however, that "typical testing" to confirm the presence of either GBS or SFN (such as a lumbar puncture to test for inflammation in the cerebrospinal fluid) did not occur. *Id.*

Dr. Hixson reiterated his arguments about the diagnostic features of acute onset SFN, contesting the views of Respondent's neurologic expert (Dr. Brian Callaghan). Second Hixson Rep. at 2–3. He noted (referencing Gendre) that this form of SFN was increasingly recognized, but may be "challenging in clinical practice" to identify. Gendre at 7. And SFN, like GBS, had been associated with infections and vaccinations, plus a "pure sensory" form of GBS was understood to exist. Second Hixson Rep. at 2; Seneviratne & Gunasekera at 540.

Dr. Callaghan had pointed to Petitioner's weakness and gait issues as inconsistent with SFN. Second Hixson Rep. at 3. Dr. Hixson agreed that SFN mainly featured "sensory phenomena," but contended that these kind of problems could secondarily impact gait or balance, as Petitioner's evolving course revealed. And Petitioner's apparent subjective weakness observed by Dr. Wilks did not result in his rejection of the SFN diagnosis. *Id.* Other symptoms identified by Dr. Callaghan as inconsistent with SFN were not given weight by Petitioner's treaters in embracing the SFN diagnosis. *Id.* At bottom, Dr. Hixson described Petitioner's course as "a relatively acute onset of distal paresthesias" leading to ascending symptoms and gait issues a few weeks later as supportive of the SFN diagnosis—and other comorbidities or conditions she had experienced did not invalidate the diagnosis. *Id.*

Dr. Hixson next addressed the views of Respondent's immunologic expert (Dr. Robert Fujinami) regarding what mechanism might be involved in Tdap vaccine-caused SFN. He accepted Dr. Fujinami's opinion that insufficient evidence established either that SFN is autoimmune in nature, or that the Tdap vaccine could provoke it immunologically. Second Hixson Rep. at 3. But he asserted in response that *some* proof supported both contentions, and that he had filed it in this case. *See,* e.g., Gendre. Dr. Hixson also vouched for case reports as good evidence, argued that Dr. Fujinami appeared to require proof of certainty, and that the Vaccine Program only required "a *plausible* theory with supportive evidence" to meet the evidentiary threshold for entitlement. *Id.* at 3–4 (emphasis added).

Dr. Hixson further reiterated why he felt onset of Petitioner's symptoms occurred in a medically-acceptable timeframe, measured from the date of vaccination. He disputed Dr. Callaghan's proposal that Petitioner's neurological issues pre-dated vaccination, with head pain that could be attributed to occipital neuralgia as unrelated to SFN. He also embraced a 3–42 day

8

timeframe for post-vaccination adverse events as an "accepted window for a predicated vaccine-mediated immune response" driven by an autoimmune cross-reaction. Second Hixson Rep. at 4.

B.     Respondent's Experts

1.     *Dr. Brian Callaghan* – Dr. Callaghan, a practicing and academic neurologist like Dr. Hixson, offered an opinion on behalf of Respondent. Report, dated March 3, 2025, filed as Ex. A (ECF No. 18-1) ("Callaghan Rep."). Dr. Callaghan did not accept SFN as the best diagnosis for Petitioner's symptoms. Callaghan Rep. at 8.

Dr. Callaghan is Professor of Neurology and an Associate Program Director for Research at the University of Michigan. Curriculum Vitae, filed as Ex. B (ECF No. 18-4) at 2. Dr. Callaghan both received his medical degree and completed his residency in Neurology at the University of Pennsylvania Medical Center. *Id.* at 1. Afterwards, he earned his master's degree and completed two postdoctoral fellowships at the University of Michigan. *Id.* Dr. Callaghan is board certified in both Neurology and Electrodiagnostic Medicine. *Id.* Throughout his practice, Dr. Callaghan has served as the Director of the Amyotrophic Lateral Sclerosis Clinic at the University of Michigan Health System, treated many patients with neuropathies and neurologic disorders, and has published over one-hundred peer reviewed articles. *Id.* at 2, 19–29.

Dr. Callaghan summarized Petitioner's overall medical record history before providing his opinion. Callaghan Rep. at 1–4, 5–6. He took greater note than Dr. Hixson, however, of Petitioner's reported history at the time of her April 2021 emergency presentation, emphasizing that she had stated that "[s]he was gambling at a casino, with her right arm placed on a table, when she noted that her right arm became sore and achy. She had pain when she flexed or extended her wrist. The pain was noted to be in the part of the forearm that rested on the table." *Id.* at 2 (referencing Ex. 2 at 12). Dr. Callaghan also highlighted her documented ambulation limits early on and that summer, as well as her overall weakness plus pain in 2022. *Id.* at 2–4.

Dr. Callaghan did not deem Petitioner's history to fit the diagnostic criteria for SFN. Callaghan Rep. at 6–7. First, he identified a lengthy list of symptoms experienced by Petitioner but inconsistent with SFN. *Id.* at 6 ("difficulty moving her neck, swelling of her right arm and legs, trouble with ambulating, heavy legs, weakness requiring a walker and wheelchair, inability to carry her daughters, use a cellular telephone, or type, falls, cramping in her calves, muscle fatigue, trouble with carrying heavy loads in her arms, barely being able to walk, . . . burning in her right eye and in her hands and feet after starting ciprofloxacin (previous adverse event as well with this medication), burning in her stomach, worsening headaches, nausea, . . .". Second, Dr. Callaghan deemed the clinical exam evidence that Petitioner was experiencing weakness and reduced reflexes to be proof of a "large fiber neuropathy. *Id.* Dr. Callaghan also noted that Petitioner had received two neurologic exams that were deemed to produce normal results. *Id.*

Dr. Callaghan also did not find compelling Dr. Hixson's contention that Petitioner's SFN may have followed an undiagnosed case of GBS. In so opining, Dr. Hixson relied on statements made by Dr. Wilks in December 2021,[5] but Dr. Callaghan felt Dr. Schloesser's prior diagnostic view from June 2021 (that Petitioner had experienced some kind of "unexplained paresthesias") more persuasive in light of exam and testing findings. Callaghan Rep. at 6. He felt it "highly unlikely" that Petitioner had experienced both AIDP and SFN, which constituted "two separate diagnoses." *Id.* at 7.

SFN, Dr. Callaghan maintained, is not reasonably associated with vaccination. Callaghan Rep. at 7. Dr. Callaghan maintained that he was unaware of scientific evidence linking the two, and disputed the evidentiary significance of case reports on the question of causation. *Id.* He questioned whether a flu vaccine-GBS association had applicability in the context of a different vaccine like Tdap. *Id.* Dr. Callaghan also denied it had been shown that receipt of the Tdap vaccine could provoke SFN later via autoantibody production attributable to cross-reaction between vaccine components (through the mechanism of molecular mimicry between self and presenting antigen). *Id.* While that theory applied to a "demyelinating neuropathy" like GBS (which involved myelinated larger peripheral nerves), the *unmyelinated* sensory nerves were distinguishable, and involved a wholly-different set of clinical symptoms attributable to their harm. *Id.*; N. Yuki, et al., *Carbohydrate Mimicry Between Human Ganglioside GM1 and Campylobacter Jejuni Lipooligosaccharide Causes Guillain–Barré Syndrome*, 101 PNAS 11404 (Aug. 3, 2004), filed as Ex. C Tab 8 (ECF No. 19-9).

Finally, Dr. Callaghan addressed the timeframe in which Petitioner's injury manifested after vaccination. He denied the relevance of the Vaccine Table's 3–42 day period for flu vaccine-caused GBS, since Petitioner had not likely experienced GBS, and did not receive the flu vaccine either. Callaghan Rep. at 7. In addition, the record established a neurologic symptom experienced by Petitioner (right-sided head pain thought to reflect occipital neuralgia) *before* vaccination—meaning any condition she suffered from may already have existed when she received the Tdap vaccine. *Id.* at 7–8. It was not reasonable to ignore the potential relationship between these symptoms and what Petitioner experienced later.

2.    *Dr. Robert Fujinami* – Dr. Fujinami, a renowned immunologist, prepared a single Report for Respondent. Report, dated March 4, 2025, filed as Ex. C (ECF No. 19-1) ("Fujinami Rep."). He disputed Petitioner's contention that the Tdap vaccine could cause SFN in the manner proposed. Fujinami Rep. at 10.

---

[5] Dr. Callaghan seemed to partially question the accuracy of Dr. Wilks's exam, noting that he deemed a toe vibration sensation test result normal, when it was in fact inconsistent with accepted parameters. Callaghan Rep. at 6.

Dr. Fujinami holds a Ph.D. in immunology from Northwestern University, where he studied how autoimmune nervous system diseases are initiated in the neonate. Curriculum Vitae, filed as Ex. D (ECF No. 19-10) ("Fujinami CV") at 1; Fujinami Rep. at 1. He attended postdoctoral training at The Scripps Research Institute where he investigated how viruses and infections could induce autoimmune disease.  Fujinami Rep. at 1. He was a pioneer of the concept of molecular mimicry, and helped introduce the concept to the medical field. *Id*. Dr. Fujinami has served as an Associate Professor in University of California, San Diego's Department of Pathology and studied virus triggers for neuroinflammatory autoimmune disease, before becoming a professor at The University of Utah. *Id*.; Fujinami CV at 1. Dr. Fujinami still serves as a professor at The University of Utah in its Department of Neurology, where he continues to study virus-host interactions. Fujinami Rep. at 1–2. Dr. Fujinami expressly deferred to Dr. Callaghan as to the propriety of the disputed SFN diagnosis. *Id.* at 3.

Overall, Dr. Fujinami opined that Petitioner's causation theory seeking to link SFN to the Tdap vaccine had "little or no support from the scientific literature." Fujinami Rep. at 3. Dr. Fujinami argued that Dr. Hixson had identified insufficient independent support for the contention that SFN was likely an autoimmune neuropathy, noting that the evidence that was provided came in the form of case reports (with one even concluding the discussed patient had experienced not SFN but a sensory form of GBS). *Id.* at 3–4*; J. Yang, et al., Pure Sensory Guillain-Barré Syndrome: A Case Report and Review of the Literature*¸ 8 Experimental Therapeutic Med. 1397 (2014), filed as Ex. 23 (ECF No. 15-14). Dr. Fujinami, like Dr. Callaghan, deemed SFN and GBS to be distinguishable. *Id.* at 4; N. Yuki & H-P. Hartung, *Guillain–Barré Syndrome*, 336 N. Engl. J. Med. 2294 (2012), filed as Ex. C Tab 7 (ECF No. 19-8) ("Yuki & Hartung") (SFN not identified as a GBS variant). And the medical record did not establish that Petitioner likely had GBS in the first place. As a result, evidence about the autoimmune nature of GBS and its potential triggers had little value in establishing a vaccine-SFN relationship. Fujinami Rep. at 4–5.[6]

The specific mechanism proposed by Petitioner for how the Tdap vaccine could potentially lead to SFN—molecular mimicry between components of the vaccine and self amino acid peptide sequences in nerve components, leading to cross-reactive attack by antibodies first generated against the vaccine antigens—was also inadequately substantiated, in Dr. Fujinami's view. One of the primary items of literature offered for this contention by Petitioner was a review article. M. Blank et al., *Molecular Mimicry in Autoimmunity and Vaccinations,* filed as Ex. 15 (EC No. 15-6) ("Blank"). But although Blank does mention an animal study looking at the association between tetanus-containing vaccines and "antiphospholipid syndrome" (an unrelated disease believed to be mediated by molecular mimicry), it did not have analogous force for SFN (and the findings of the

---

[6] Dr. Fujinami also discussed his evaluation of certain items of literature filed by Petitioner, which not only involved GBS but stood (in his reading) for the proposition that certain vaccines did not likely exacerbate preexisting GBS or likely cause it. Fujinami Rep. at 4–5. But this aspect of his opinion goes somewhat beyond the more immediate question of the SFN-vaccine relationship, and I therefore do not summarize it in detail.

11

reviewed study had not also been shown to have applicability to humans). Fujinami Rep. at 5; Blank at 4.

Another article involved GBS or known immune-mediated neuropathies—again, not SFN. B. Kieseier et al., *Immune-Mediated Neuropathies*, 4 Nature Rev. Disease Primer 1 (Oct. 11, 2018), filed as Ex. 16 (ECF No. 15-7). And a third (also focused on GBS) referred to a very old case report in which an individual developed a form of GBS (not SFN) after repeated exposure to tetanus toxoid-containing vaccines. P. Haber et al., *Vaccines and Guillain-Barre Syndrome*, 32 Drug Safety 309 (2009), filed as Ex. 17 (ECF No. 15-8) ("Haber").[7] Haber also referenced surveillance data that supported the view that the risk of GBS post-receipt of tetanus toxoid-containing vaccines was no greater than the expected background rate, further undermining a possible vaccine connection here (assuming that *any* evidence relating to GBS had evidentiary value in the context of SFN). Fujinami Rep. at 5–6; Haber at 314.

Studies more specific to SFN were equally unhelpful to Petitioner, Dr. Fujinami contended. Gendre, he noted, was a case series involving only *one* patient (out of 20 studied) whose SFN was speculated to have been associated with a vaccine comparable to Tdap—and that individual had been diagnosed only with *probable* SFN. Gendre at 6. Moreover, the study's authors used an incomplete methodology (as part of an animal test) to determine if antibodies potentially produced in reaction to the vaccine were actually specific for a putative target of attack leading to SFN (as opposed to also cross reactive with other tissues in the body). Fujinami Rep. at 6; Gendre at 2–5. And the source/target nerve tissue used for the study was obtained from dorsal root ganglia near the spine—raising the possibility of contagion of the tissue sample by central nervous system tissues, and thus again underscoring the need for better controls lacking in this study. Fujinami Rep. at 6; Gendre at 3.

Dr. Fujinami leveled other criticisms against the contention that the Tdap vaccine could be linked to SFN. For example, he observed that Petitioner's vaccination was a booster—and yet she never developed SFN after the prior Tdap doses she had received. Fujinami Rep. at 5. Dr. Hixson also relied on a number of case reports (a form of evidence not all that probative in resolving causation) involving distinguishable vaccines, like the COVID-19 vaccine. *Id.* at 7.

A parallel deficiency in the proposed causation theory, Dr. Fujinami argued, was the fact that vaccination generally could not be assumed to have the same overall immune impact as a wild viral or bacterial infection. Fujinami Rep. at 8 ("[m]icrobial infections are very different from

---

[7] The case report mentioned in Haber relating to exposure to the tetanus toxoid vaccine (comparable to the tetanus component of Tdap) is one often referenced by claimants when trying to prove a GBS-Tdap relationship. Haber at 315 (citing J. Pollard & G. Selby, *Relapsing Allergic Neuropathy due to Tetanus Toxoid: Report of a Case*, 14 J. Neurol. Sci. 113–25, (1978)). But I have repeatedly noted that Pollard & Selby only applies at best to a particular GBS variant (chronic inflammatory demyelinating polyneuropathy)—and even then is of dubious evidentiary value. *DeVaughn v. Sec'y of Health & Hum. Servs.,* No. 22-832V, 2025 WL 758128, at *6 (Fed. Cl. Spec. Mstr. Feb. 10, 2025).

vaccinations with subunit vaccines, such as Tdap"). Wild infections infect, then replicate and disseminate within the human body, but "subunit"[8] vaccines like Tdap are by-design inactivated, and cannot result in replication or dissemination. *Id.* This means it is far less likely vaccination can ever cause disease, given its more focused and limited impact on the immune system.

Specific studies had, in fact, revealed that this distinction was meaningful in understanding the relative risk of wild infection versus vaccination. J. Croxford et al., *Viral Delivery of an Epitope from Haemophilus Influenzae Induces Central Nervous System Autoimmune Disease by Molecular Mimicry,* 174 J. Immunol. 2:907 (2005), filed as Ex. C-2 (ECF No. 19-3) ("Croxford"). Croxford's authors identified a molecular mimic between a viral microbe and an "encephalitogenic peptide" (antigenic target for precipitating disease) in mice, then tested whether exposure to the foreign antigen could trigger disease. A genetically-engineered version of the virus (with "the mimicking peptide encoded in its genome") did trigger disease when the study mice were immunized with it—but exposure to the non-engineered form did not (even in the context of a powerful experimental adjuvant used to heighten the response for purposes of study). Fujinami Rep. at 8; Croxford at 909. Thus, exposure to the peptide alone did not spark disease, even if it was an identified mimic—and that kind of exposure was akin to what a person experiences when vaccinated. Fujinami Rep. at 8.

Dr. Fujinami also addressed some of the other elements Petitioner must establish to prove causation. First, Dr. Fujinami disputed that Petitioner had shown receipt of the Tdap vaccine likely "did cause" her to experience SFN. Fujinami Rep. at 9. Dr. Hixson seemed to place great weight on the temporal association between the time of vaccination and Petitioner's subsequent development of SFN over weeks to months, but without citing other evidence demonstrating how a putative disease process actually unfolded. *Id.* But multiple criteria would need to be satisfied to get from vaccination to autoimmune disease—with none fulfilled. N. Shahrizaila & N. Yuki, *Guillain-Barre Syndrome Animal Model: The First Proof of Molecular Mimicry in Human Autoimmune Disorder*, 2011 J. Biomedicine Biotechnology 1 (Dec. 15, 2010), filed as Ex. C-6 (ECF No. 19-7).

Dr. Fujinami further denied that it had been preponderantly demonstrated that the timeframe between Petitioner's late-March 2021 vaccination and onset was medically acceptable. Fujinami Rep. at 9. Because it was not established by Dr. Hixson that SFN was necessarily autoimmune pathogenically, arguments about what is known regarding the timeframe for GBS to develop post-trigger were not relevant. *Id.* Petitioner had not even been diagnosed with GBS to begin with (and many treaters had expressed doubt her presentation fit its diagnostic requirements). *Id.* at 9–10; Ex. 3 at 6 (treatment by neurologist Dr. Schloesser in September 13, 2021). As a result,

---

[8] Subunit means a type of vaccine that uses only specific, purified parts of a pathogen, rather than the entire virus or bacterium, to stimulate an immune response. They are distinguishable from vaccines that contain live viral or bacterial components. *Subunit*, Dorland's Illustrated Medical Dictionary (33rd ed. 2020).

there was no evidence establishing what would be a reasonable timeframe for SFN developing after vaccination.

## III.    Procedural History

This case was initiated in the early fall of 2023. Almost one year later, Respondent filed his Rule 4(c) Report opposing compensation. ECF No. 14. Thereafter, the parties obtained the aforementioned expert opinions, completing the process of filing reports by June 2025. I subsequently set a schedule for Ruling on the Record (in particular focusing on diagnosis), and the matter became ripe last October.

## IV.    Parties' Arguments

*Petitioner*

Petitioner argues that she experienced acute-onset SFN, and that the record supports this as the best diagnosis for her injury, pointing to her submitted medical literature as reflecting the diagnosis's propriety. Br. at 10–11. Acute-onset SFN is characterized by sudden onset of symptoms, normal EMG/NCS studies, and has been observed following preceding events such as infection or vaccination. *Id.* at 10 (citing Gendre at 2, 4, 7). Symptoms of pain, tingling, sensory disturbances, and partial and gradual improvement are associated with SFN. *Id.* at 8.

Comparing her medical records to Gendre and other items of literature, Petitioner claims that her clinical course and symptoms align with the diagnostic criteria of acute-onset SFN. Br. at 10–11. Petitioner's medical records show that she experienced right forearm pain, paresthesias, and swelling when she was admitted to the hospital just shy of two weeks after her vaccine. *Id.* at 8 (citing Ex. 2 at 12–17). Her neurologic symptoms developed into generalized numbness and tingling in her extremities and she soon experienced gait difficulty, imbalance, and pain on the pads of her feet. *Id.* (citing Ex. 3 at 8–9). Other symptoms, particularly her paresthesias and pain, were repeated and persistent throughout her course despite normal neurological imaging and normal NCS testing. *Id.* at 9 (citing Ex. 3 at 5–6, 17). Petitioner claims these symptoms are aligned with the diagnostic criteria for SFN. *See id.* at 8–9.

Petitioner also argues that her ongoing clinical course further supports a SFN diagnosis. To this day, Petitioner continues to experience neurologic symptoms of burning and tingling sensations. Br. at 9–10 (citing Ex. 5 at 42). Petitioner has complained of continuous nocturnal calf cramps and trouble with strenuous activity, such as walking long distances, exercising, and picking up her children. *Id.* (citing Ex. 4 at 29–35, 56). Petitioner also demonstrated partial and gradual improvement, which she claims is consistent with SFN that improves but does not completely resolve. *Id.* at 10 (citing Ex. 18. at 6).

14

In addition, Petitioner offers her treating providers' testing results and diagnostic opinions as further support for a SFN diagnosis. Br. at 9–10. Dr. Wilks noted that Petitioner's EMG/NCS findings were normal after documenting pinprick gradient in the arms and legs. *Id.* at 9 (citing Ex. 5 at 44). Dr. Wilks deemed this sufficient to confirm his clinical suspicion for SFN. *Id.* (citing Ex. 5 at 44). Dr. Hixson also opined that Petitioner's proper diagnosis is SFN because Petitioner's clinical course, symptom pattern, and normal MRI and NCS results are consistent with such. *Id.* at 10 (discussing First Hixson Rep. at 4–5).

Petitioner and her experts maintain that SFN is the proper diagnosis even in the absence of traditional testing results. Br. at 10. Petitioner's record is notably void of skin biopsy or QST, and laser-evoked potentials—common tests for diagnosing SFN. *See id.* However, as Petitioner's expert noted, these test are not a *requirement* for diagnosis, and Petitioner's medical record is strong enough to support a SFN diagnosis without them. *Id.* In addition, Petitioner maintains that her unsteady gait is consistent with SFN and not evidence of a different condition. *Id.* at 10. In support, she referenced Dr. Hixson's opinion that sensory loss can produce imbalance and unsteady gait even without motor weakness. *Id.*

In her reply, Petitioner reiterated the arguments set forth in her brief and maintains that she has shown her proper diagnosis is SFN by a preponderance of the evidence. *See generally* Reply.

*Respondent*

Respondent disputes Petitioner's diagnosis, maintaining it lacks record support and is otherwise inconsistent with the filed literature. Opp. at 9. To begin, Respondent argues that Petitioner's early post-vaccination symptoms and pathologic course are not consistent with SFN. *Id.* at 10. Petitioner's records show that her earliest presentation featured unilateral pain, paresthesias, and swelling affecting only her right forearm, whereas SFN presents symmetrically. *Id.* at 11 (citing Br. at 8; Ex. 2 at 12; and Gendre at 2). Dr. Callaghan's review of her medical records also revealed instances of edema, swelling, and significant gait disturbance, which are not clinical features of SFN. *Id.* (discussing Callaghan Rep. at 6). Similarly, Petitioner complained symptoms of trouble exercising and carrying her children and heavy loads are also inconsistent with SFN. *Id.* (citing Callaghan Rep. at 6).

Petitioner's testing and persistence of paresthesias in light of her results does not support SFN either. Opp. at 12. Respondent notes that SFN affects small fibers that are characteristically thinly or unmyelinated, and presents with symptoms such as neuropathic pain, paresthesia, and loss of pinprick and thermal sensitivity. *Id.* at 9–10 (citing Gendre at 2). Testing typical to diagnose SFN includes quantitative sudomotor axon reflex testing ("QSART") testing, QST, and skin biopsies to assess the epidermal nerve fiber density. *Id.* at 10 (citing C. Gibbons, *Small Fiber*

*Neuropathies*, 20 Continuum 1398 (2014), filed as Ex. 19 (ECF No. 15-10) ("Gibbons")). However, Petitioner never underwent QSART testing. *See id.*

Petitioner at most underwent EMG and NCS testing. Opp. at 10. But because SFN involves only small fibers, not large fibers, EMGs and NCS are unreliable for diagnosing SFN (and in fact will yield normal results in SFN patients—as here). *Id.* (citing Gibbons at 1402). However, Petitioner's reliance on persisting paresthesias in light of her normal EMG and NCS testing as evidence of SFN is misplaced. *Id.* at 12. Dr. Schloesser did not diagnose her with SFN after her test results. *Id.* (citing Ex. 3 at 6). Rather, Dr. Schloesser documented "unexplained paresthesias" alongside normal NCS results, and recommended gabapentin to alleviate her symptoms. *Id.* (citing Ex. 3 at 6). The records from this visit and Petitioner's test results do not show a confirmatory diagnosis of SFN. *Id.*

In addition, Dr. Wilks also never reached a confirmatory diagnosis of SFN. Opp. at 13. Rather, Respondent argues, Dr. Wilks's medical notes only opine that it was "possible" that Petitioner was suffering from a mild form of GBS or acute SFN. *Id.* (citing Ex. 5 at 44). While Dr. Wilks did include that his suspicion of SFN was confirmed later, after Petitioner's normal EMG and NCS test results, Respondent argues that this is the product of flawed logic, for it makes no sense to favor SFN simply because GBS or some other comparable neuropathy could not be confirmed. *Id.*

Respondent also claims that Dr. Hixson's expert opinion does not stand as reliable support for the SFN diagnosis. Opp. at 15. Dr. Hixson's conclusions did not account for the numerous symptoms not associated with SFN that Petitioner exhibited, such as stiff neck, limb swelling, general weakness, diminished reflexes, cramping, muscle fatigue, and urinary and gastrointestinal complaints. *Id.* (citing Callaghan Rep. at 6). Dr. Callaghan specifically explained these symptoms reflect complications of large fiber processes—not small fibers. *Id.* (citing Callaghan Rep. at 6; Ex. 3 at 5). Dr. Hixson's efforts to attribute Petitioner's imbalance and unsteady gait to sensory loss are undermined by Petitioner's medical records that show diminished reflexes and weakness—further implications of large fiber processes. *Id.* at 16 (citing Second Hixson Rep. at 6; Ex. 1 at 92–93; Ex. 3 at 9).

At most, Petitioner has shown a temporal association between her vaccine and injury, but even this does not salvage her claim. Opp. at 16–17. Petitioner's submitted medical literature does not offer more than describing potential clinical scenarios and does not support SFN diagnosis based on Petitioner's symptoms. *Id.* at 17. Based on the above, Respondent argues that Petitioner has failed to establish she suffered from SFN by a preponderance of the evidence. *See id.*

Respondent did not address vaccine causation in his opposition brief, but did incorporate by reference his Rule 4(c) Report, which challenges Petitioner's causation argument. *See* Opp. at

16

2 (citing Respondent's Report, dated Aug. 14, 2024 (ECF No. 14) ("Report") at 12–15). Respondent argues that, even if Petitioner did suffer SFN, Petitioner has failed to provide a medical theory causally connecting the Tdap vaccine to SFN. *Id.* (citing Report at 12–15). Petitioner's theory rests upon Dr. Wilks' opinion that Petitioner could be suffering from acute SFN, and "[t]he proximity of [petitioner's] symptoms onset to vaccination could be consistent" with such a diagnosis. Report at 13 (quoting Ex. 5 at 44). However, Dr. Wilks next wrote "the association with vaccination is unclear and not definitive." *Id.* (quoting Ex. 5 at 44). To the extent that Dr. Wilks' statements count as a causation opinion, Respondent asserts that it is equivocal, and only has a temporal association to support such a claim. *Id.* at 14. Therefore, Petitioner has failed to put forward a medical theory causally connecting the Tdap vaccine to her injury, and she has failed her requisite showing. *Id.* at 14–15.

## V.    Applicable Legal Standards

### A.    *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table— corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[9] There is no Table claim for SFN after receipt of any covered vaccine.

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed.

---

[9] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. App'x. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Sec'y of Health and Hum. Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

Each *Althen* prong requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378–79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325–26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Distinguishing between "preponderant evidence" and "medical certainty" is important because special masters must take care not to impose an evidentiary burden that is too high. *Bunting*, 931 F.2d at 873 ("The standard of proof required by the [Vaccine] Act is simple preponderance of evidence; not scientific certainty.... [I]t is not plaintiff's burden to disprove every possible ground of causation suggested by defendant nor must the findings of the court meet the standards of the laboratorian.") (citations and internal quotation marks omitted).

In discussing the evidentiary standard applicable to the first *Althen* prong, the Federal Circuit has consistently rejected the contention that it can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility*. *See Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1122 (Fed. Cir. 2025); *Kalajdzic v. Sec'y of Health & Hum. Servs.*, No. 2023-1321, 2024 WL 3064398, at *2 (Fed. Cir. June 20, 2024) (arguments "for a less than preponderance standard" deemed "plainly inconsistent with our precedent" (*citing Moberly*, 592 F.3d at 1322)); *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *see also Demore v. Sec'y of Health & Hum. Servs.*, No. 20-1265V, 2024 WL 4542934 (Fed. Cl.

18

Spec. Mstr. Sept. 26, 2024), *aff'd*, No. 20-1265V, 2025 WL 868902, at \*4 (Fed. Cl. Mar. 20, 2025) (rejecting the argument that a petitioner's burden is to prove that a causation theory is *plausible* and instead requiring petitioner to prove the theory by a preponderance of the evidence) (emphasis added). And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted); *Tarsell v. United States*, 133 Fed. Cl. 782, 793 (2017) (noting that *Moberly* "addresses the petitioner's overall burden of proving causation-in-fact under the Vaccine Act" by a preponderance standard).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Medical records and statements of a treating physician, however, do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should be weighed against other, contrary evidence also present in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Dept. of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813, at \*17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant

19

proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *De Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

### B.     *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11I(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras*, 993 F.2d at 1525 ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

20

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony— especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

21

C.    *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs*., 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). Under *Daubert*, the factors for analyzing the reliability of testimony are:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

In the Vaccine Program the *Daubert* factors play a slightly different role than they do when applied in other federal judicial settings, like the district courts. Typically, *Daubert* factors are employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable or could confuse a jury. By contrast, in Vaccine Program cases these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs*., 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs*., 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)); *see also Isaac v. Sec'y of Health & Hum.*

*Servs.*, No. 08–601V, 2012 WL 3609993, at \*17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for review den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x. 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

D.     *Consideration of Medical Literature*

Both parties filed medical and scientific literature in this case, but not all such items factor into the outcome of this decision. While I have reviewed all the medical literature submitted, I discuss only those articles that are most relevant to my determination and/or are central to Petitioner's case—just as I have not exhaustively discussed every individual medical record filed. *Moriarty v. Sec'y of Health & Hum. Servs.*, No. 2015–5072, 2016 WL 1358616, at \*5 (Fed. Cir. Apr. 6, 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.,* 527 F. App'x 875, 884 (Fed. Cir. 2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered").

E.     *Resolution of Claim Upon Written Record*

I have opted to decide entitlement in this case based on written submissions and evidentiary filings, including the expert reports filed by each side. The Vaccine Act and Rules not only contemplate but encourage special masters to decide petitions on the papers rather than via evidentiary hearing, where (in the exercise of their discretion) they conclude that the former means of adjudication will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d). The choice to do so has been affirmed on appeal. *See D'Toile v. Sec'y of Health & Hum. Servs.*, No. 15-85V, 2018 WL 1750619, at \*2 (Fed. Cir. Apr. 12, 2018); *see also Hooker v. Sec'y of Health & Hum. Servs.*, No. 02-472V, 2016 WL 3456435, at \*21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided on the papers in lieu of hearing and that decision was upheld). I am simply not required to hold a hearing in every matter, no matter the preferences of the parties. *Hovey v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 397, 402–03 (1997) (special master acted within his discretion in denying evidentiary hearing); *Burns*, 3 F.3d at 417.

23

## ANALYSIS

### I.   Overview of SFN and its Treatment as Program Injury

As noted above, SFN is defined as a disorder affecting the small, mainly-unmyelinated somatic and autonomic nerve fibers. *See* Gibbons at 1398; *see also* Gendre at 2. It results in the loss of cold and pain perception, along with developing sensations of burning and numbness in the feet and toes, which gradually spreads through the patient's limbs and atypically to the trunk and face. Gibbons at 1399. Most neurologic evaluations of SFN patients yield normal results, however, so confirmation of the diagnosis via a skin biopsy or QST/QSART test is necessary. *Id.* at 1402–04.

SFN is readily distinguishable from other neuropathic injuries thought to be vaccine-associated, like GBS, the diagnosis of which requires proof of the existence of several criteria, and under different diagnostic schema. Yuki & Hartung at 2295–96. Those diagnostic criteria include evidence of "[p]rogressive weakness of the arms and/or legs, ranging from minimal weakness of the legs to total paralysis of all four limbs, and including the trunk, bulbar and facial muscles, and external ophthalmoplegia" and "[a]reflexia or decreased deep tendon reflexes in weak limbs." S. Chandrashekhar & M. Dimachkie, *Guillain-Barré Syndrome in Adults: Pathogenesis, Clinical Features, and Diagnosis*, Wolters Kluwer: UpToDate, 16–17 (July 19, 2022), filed as Ex. 13 (ECF No. 15-4), https://www.uptodate.com/contents/guillain-barre-syndrome-in-adults-pathogenesis-clinical-features-and-diagnosis (last visited May 27, 2026). The Brighton diagnostic criteria for GBS requires at the very least evidence of bilateral *and* flaccid weakness of the limbs; decreased or absent deep tendon reflexes in weak limbs; monophasic illness pattern and interval between onset and nadir of weakness between 12 hours and 28 days and subsequent clinical plateau; and absence of identified alternative diagnosis for weakness. Haber at 2296. SFN has at best been deemed a *possible* secondary result of GBS, but it is not defined as a GBS variant. Seneviratne & Gunasekera at 542.

SFN has been alleged as a vaccine injury in prior cases, and petitioners have succeeded in these claims, although such decisions shed little light on the analytical basis for these determinations.[10] *See, e.g., Coons v. Sec'y of Health & Hum. Servs.*, No. 20-1067V, 2024 WL 1741619, at \*23–31 (Fed. Cl. Spec. Mstr. Mar. 29, 2024); *Swaiss v. Sec'y of Health & Hum. Servs.*, No. 15-286V, 2019 WL 6520791, at \*17, 27 (Fed. Cl. Spec. Mstr. Nov. 4, 2019) (granting entitlement but noting that "the limited case reports proposing a GBS small fiber variant invoke

---

[10] Prior decisions from different cases do not control the outcome herein. *Boatmon*, 941 F.3d at 1358–59; *Hanlon* , 40 Fed. Cl. at 630. But special masters reasonably draw upon their experience in resolving Vaccine Act claims. *Doe v. Sec'y of Health & Hum. Servs.*, 76 Fed. Cl. 328, 338–39 (2007) ("[o]ne reason that proceedings are more expeditious in the hands of special masters is that the special masters have the expertise and experience to know the type of information that is most probative of a claim") (emphasis added). They would therefore be remiss in ignoring prior cases presenting similar theories or factual circumstances, along with the reasoning employed in reaching such decisions.

molecular mimicry and call for further research on the specific cross-reactivity involved"); *Doe v. Sec'y of Dep't of Health & Hum. Servs.*, 2007 WL 3120297, at *7 (Fed. Cl. Spec. Mstr. Oct. 18, 2007) (finding that the flu vaccine caused petitioner's serum sickness and SFN).

However, as often as not claims alleging SFN as an injury have been unsuccessful—and the decisions reaching that finding are more robust and illuminating in explaining their rationales. *See, e.g., Fantini v. Sec'y of Health & Hum. Servs.*, No. 15-1332V, 2022 WL 1760730, at *21 (Fed. Cl. Spec. Mstr. May 2, 2022); *Todd v. Sec'y of Health & Hum. Servs.*, No. 15-860V, 2020 WL 727973 at *21 (Fed. Cl. Spec. Mstr. Jan. 8, 2020) (denying entitlement for SFN allegedly caused by flu vaccine where petitioner failed to establish the existence of systemic inflammation that would be associated with a chronic autoimmune neuropathy); *Lapierre v. Sec'y of Health & Hum. Servs.*, No. 17-227V, 2019 WL 6490730, at *20 (Fed. Cl. Spec. Mstr. Oct. 18, 2019); *Jones v. Sec'y of Health & Hum. Servs.*, No. 15-1239V, 2018 WL 7139212, at *17 (Fed. Cl. Spec. Mstr. Dec. 21, 2018) (finding that a petitioner's non-specific symptoms were not a basis for entitlement); *Shaw v. Sec'y of Health & Hum. Servs.*, No. 1-0707, 2013 WL 2897425, at *16 (Fed. Cl. Spec. Mstr. May 24, 2013) (". . .the medical literature does not specifically link the hepatitis B vaccination or any vaccination to the injury of small fiber neuropathy").

I have acknowledged in a prior decision that it cannot be assumed SFN is even pathogenically autoimmune. *E.S. v. Sec'y of Health & Hum. Servs.*, No. 17-480V, 2020 WL 9076620, at *45 (Fed. Cl. Spec. Mstr. Nov. 13, 2020), *mot. for review den'd,* 154 Fed. Cl. 149 (2021). And in many cases the SFN diagnosis appears to be applied without all that much in the way of clinical corroboration. The neurologist who first diagnosed the petitioner in *Fantini,* for example, observed some symptoms of SFN that he believed could be autoimmune in origin—but he did not fully embrace this diagnosis years later. 2022 WL 1760730, at *20. In addition, another treater who diagnosed the *Fantini* claimant with SFN was less reliable, as her diagnosis was arrived at without seeing the patient first hand, and was made after the case was initiated. *Id.* In addition, this diagnosis had little record support and lacked staunch corroboration from treating providers. *Id.*

## II.    Petitioner Has Not Preponderantly Established SFN as Her Likely Injury

It is often appropriate for a special master to first determine whether an alleged injury has evidentiary support before applying the *Althen* test—particularly when the injury is disputed, so that "the special master [can] subsequently determine causation relative to the injury." *Broekelschen*, 618 F.3d at 1346. In some cases, determining the injury obviates entirely the need for an *Althen* analysis, since the petitioner's claim, and causation theory, is dependent on a finding of a specific injury. *Id.*

In this case, the parties dispute the SFN diagnosis (the sole injury alleged). Although I cannot ascertain on this record the most likely nature of (and hence proper descriptor for) Petitioner's symptoms, I find she has not preponderantly established SFN as the likely injury, for

25

several reasons. First, Petitioner's presentation and constellation of symptoms are not generally consistent with SFN. Petitioner's edema, swelling, significant gait disturbance, and difficulty exercising and carrying heavy loads are not clinical features of SFN. *See generally* Gibbons. And it has not been shown SFN evolves from nonspecific concerns to sensory issues months later.

Second, test results that would confirm the presence of SFN are absent from the record. In particular, no QST or QSART tests were performed (which would actually measure the amount of small fiber loss in a section of skin, sufficient to confirm the absence of the relevant sensory nerves). *See* Br. at 10. Without this testing, Petitioner's diagnosis was not objectively confirmed—and this is so even if such testing is not a diagnostic criterion. Otherwise, Petitioner's treating physicians based their opinions on the lack of confirmatory diagnoses of other neuropathies that have not been shown related to SFN, like GBS, and Petitioner's myriad of symptoms. *See* Ex. 5 at 44; First Hixson Rep. at 5–6. Petitioner's treating physicians also discounted many of Petitioner's complaints in their analysis. *See* First Hixson Rep. at 5–6; Ex. 1 at 92–93; Ex. 3 at 9. Petitioner's diminished reflexes, edema, gait instability, cramping, muscle fatigue, neck stiffness, and urinary and gastrointestinal complaints are indicative of implications to large fiber processes. *See* First Hixson Rep. at 5–6;  Ex. 1 at 92–93; Ex. 3 at 9; Callaghan Rep. at 6. When assessed as a whole, the record establishes that Petitioner's symptoms were largely nonspecific.

Third (and particularly compelling), Petitioner's immediate post-vaccine medical presentation establishes medical facts undermining the conclusion that Petitioner's later-diagnosed SFN (many months later) was present much earlier. Petitioner herself described an onset of neurologic symptoms in her arm due to its *positioning while she was seated* gambling at a casino for a period of time. Ex. 2 at 14. Further, Petitioner's initial complaint was isolated to her right arm. Ex. 2 at 12; Ex. 25 at 272. Unilateral sensory disturbance, pain, and paresthesia are not indicative of SFN—which presents symmetrically. *See id.*; Gendre at 2. It is true that Dr. Hixson deemed Petitioner's initial symptoms as an isolated mononeuropathy episode in his analysis, which still allowed for a diagnosis of SFN. *See* First Hixson Rep. at 5. But the finding of a SFN is still unsupported by this record evidence.

Finally, Petitioner's treating physician's diagnosis and opinions are not all that persuasive. Dr. Wilks's opinion, in particular, that Petitioner suffered from SFN is unreliable. This opinion was provided long after onset of Petitioner's initial symptoms, and it largely appears to have been based on Petitioner's *reported* symptoms rather than confirmatory testing in light of the contemporary medical record. First Hixson Rep. at 5.  Further, Dr. Wilks originally suggested that Petitioner could be suffering from GBS—which was inconsistent with her overall presentation, was not endorsed by initial treaters (around the time of vaccination and onset), and never corroborated by EMG or NCS results. *Id.* The most reliable statement Dr. Wilks made was that the association between vaccination and SFN is "unclear and not definitive." *Id.*

### III.    Petitioner Has Not Established Her Alleged SFN was Vaccine-Caused

Even if SFN *had* been proven as the proper diagnosis, Petitioner has not preponderantly established a causal relationship between the Tdap vaccine and SFN. Because the first *Althen* prong is unmet, there is no need to evaluate the remaining two. *Dobrydnev v. Sec'y of Health & Hum. Servs.*, 566 F. App'x 976, 979 (Fed. Cir. 2014).

The fact that reliable science establishes an association between GBS and the flu vaccine does *not* inerrantly lead to the conclusion that SFNs can also be deemed to be similarly-associated, given the facial differences in the nature of these conditions (and indeed the obvious distinctions between the kinds of nerves involved—with SFN affecting *unmyelinated* thin nerves that perform a wholly different function from the peripheral nerves involved in GBS). *See* Gendre at 9–10; Seneviratne & Gunasekera at 541.

Petitioner thus needed to offer scientific or medical evidence showing how a flu vaccine could harm the relevant nerves in SFN or initiate the condition generally (as opposed to it developing *secondarily* to GBS). But she did not do so. Dr. Hixson opined that SFN mirrored other vaccine caused injuries, like GBS, and could similarly be triggered by molecular mimicry after vaccination. First Hixon Rep. at 5. But Dr. Hixson did not produce any evidence particularly supportive of the conclusion that SFN could develop after vaccination due to molecular mimicry. *See generally id.* Rather, Dr. Hixson he offered case report-style evidence of instances where SFN developed after infection or vaccination. *Id.* at 6 (citing Gendre at 10). In addition, little reliable evidence was offered showing cytokine overproduction could be instigated by the vaccine—let alone that this in turn could cause a harmful result. Petitioner did not even discuss the innate immune system, which is arguably the aspect of the immune response associated with an overproduction of cytokines.

Petitioner's theory of molecular mimicry was no better supported. In a prior case, I rejected the theory when offered in a different context (to substantiate how the HPV and Hepatitis A vaccines—arguably different vaccines than those alleged here—could instigate an autoimmune process leading to autonomic dysfunction), where the expert witness "struggled… to specify *where* in the body this autoimmune cross-reaction was purportedly occurring." *See McKown v. Sec'y of Health & Hum. Servs.*, No. 15-1451V, 2019 WL 4072113, at *21 (Fed. Cl. Spec. Mstr. July 15, 2019) (emphasis in original). In more similarly situated cases I have emphasized that ". . . merely chanting the magic words 'molecular mimicry' in a Vaccine Act case does not render a causation theory scientifically reliable, absent additional evidence specifically tying the mechanism to the injury and/or vaccine in question." *See, e.g.*, *Mason v. Sec'y of Health & Hum. Servs.*, No. 17-1383V, 2022 WL 600415, at *27 (Fed. Cl. Spec Mstr. Feb. 4, 2022) (alleging unsuccessfully that the flu vaccine caused petitioner's CIDP, with experts opining on other possible diagnoses, which included GBS and SFN), citing *McKown*, 2019 WL 4072113, at *21, *50. Petitioner's contention herein was similarly conclusory and vague—and in fact, Dr. Hixson admitted he could not supply

all that much in the way of evidence to support the contention that the Tdap vaccine can cause SFN, relying mainly on an association with GBS to do the work form him. By contrast, Dr. Fujinami's opinion was more straightforward and persuasive.

In so maintaining, moreover, Dr. Hixson embraced a plausibility standard for evidence that is not applicable in Program cases. *See, e.g.*, Second Hixson Rep. at 3. But as noted above, claimants must establish the first *Althen* prong with preponderant evidence, and cannot prevail simply by contending that it is *plausible* a vaccine could lead to an identified injury. *Cerrone*, 146 F.4th at 1122; *Kalajdzic*, 2024 WL 3064398, at *2. While Dr. Hixson may have been able to point to some individually-reliable items of evidence that support possibly-plausible ways SFN might arise, coupled with some evidence that it may be autoimmune, and *may* be associated in part with GBS, this evidence collectively does not add up to a causation theory that has been preponderantly established, such that I can conclude it is "more likely than not" that receipt of the Tdap vaccine can lead to SFN.

## CONCLUSION

Because Petitioner has not carried her burden of proof, she is not entitled to damages. In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[11]

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[11] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.